Stefanos **ZAOUTIS, Plaintiff-Appellee,**

v.

Maurice **KILEY, as District Director for the New York District of the Immigration and Naturalization Service, and Immigration and Naturalization Service, Defendants-Appellants.**

No. 889, Docket 76–6182.

United States Court of Appeals, Second Circuit.

Argued April 26, 1977.

Decided July 12, 1977.

Daniel Riesel, New York City (Winer, Neuburger & Sive, New York City, of counsel), for plaintiff-appellee.

Robert S. Groban, Jr., Sp. Asst. U. S. Atty., New York City (Robert B. Fiske, Jr., U. S. Atty., for the Southern District of New York, Thomas H. Belote, Sp. Asst. U. S. Atty., New York City, of counsel), for defendants-appellants.

Before MANSFIELD, Circuit Judge, SMITH, Chief Judge,* and PALMIERI, District Judge.**

MANSFIELD, Circuit Judge:

The Immigration and Naturalization Service ("the INS") appeals from a decision and summary judgment entered by Judge Inzer B. Wyatt of the Southern District of New York declaring void an INS order which had rescinded appellee Stefanos Zaoutis' adjustment of status from non-immigrant to resident alien on the ground that the INS order was barred by the five-year time period prescribed by § 246(a) of the Immigration and Nationality Act, 8 U.S.C. § 1256(a).[1] We hold that the rescission proceeding was timely instituted under § 246(a) and reverse.

On November 6, 1963, Zaoutis, a citizen of Greece, was admitted to the United States as a non-immigrant employee at the Greek consulate. On January 10, 1965, he participated in a sham marriage ceremony whereby he purported to marry one Fredeswinda Camacho, a Spanish-speaking United States citizen. She had never met Zaoutis prior to the day of the ceremony, which had been arranged by one Angelo Collazo, acting in collaboration with an attorney. Immediately after the ceremony Collazo, Zaoutis and Camacho went to the attorney's office where appellee's new "wife" signed a petition (INS Form I–130), which had been prepared by the attorney, seeking adjustment of Zaoutis' status to that of resident alien, based on his having married an American citizen. For her services Camacho was paid a sum of money and provided for a period of time with an apartment under the name of Zaoutis.

Based on the petition executed by Camacho and an application by Zaoutis, the INS district director on August 25, 1965, adjust-

---

* Of the United States District Court for the District of Montana, sitting by designation.

** Of the United States District Court for the Southern District of New York, sitting by designation.

1. "(a) If, at any time within five years after the status of a person has been adjusted under the provisions of section 1254 of this title or under section 19(c) of the Immigration Act of February 5, 1917, to that of an alien lawfully admitted for permanent residence, it shall appear to the satisfaction of the Attorney General that the person was not in fact eligible for such adjustment of status, the Attorney General shall submit to the Congress a complete and detailed statement of the facts and pertinent provisions of law in the case. Such reports shall be submitted on the first and fifteenth day of each calendar month in which Congress is in session. If during the session of the Congress at which a case is reported, or prior to the close of the session of the Congress next following the session at which a case is reported, the Congress passes a concurrent resolution withdrawing suspension of deportation, the person shall thereupon be subject to all provisions of this chapter to the same extent as if the adjustment of status had not been made. If, at any time within five years after the status of a person has been otherwise adjusted under the provisions of section 1255 or 1259 of this title or any other provision of law to that of an alien lawfully admitted for permanent residence, it shall appear to the satisfaction of the Attorney General that the person was not in fact eligible for such adjustment of status, the Attorney General shall rescind the action taken granting an adjustment of status to such person and cancelling deportation in the case of such person if that occurred and the person shall thereupon be subject to all provisions of this chapter to the same extent as if the adjustment of status had not been made."

ed appellee's status to that of a permanent resident alien pursuant to §§ 201(b) and 245 of the Act, 8 U.S.C. §§ 1151, 1255, which permit such an adjustment based on an alien's marriage to a United States citizen, see 8 C.F.R. § 204.[2]

On April 5, 1967, Zaoutis travelled to Mexico and obtained an ex parte divorce from Camacho. On October 1, 1967, while temporarily in Greece, he married Helene Gaglia, a Greek citizen and childhood acquaintance, and filed with the INS an application (again on a Form I–130) seeking a preference for his new wife.

An investigation by the INS into the use of fraudulent marriages to secure immigration benefits for Greek citizens led to the conviction on May 26, 1966, of James Kaperonis, an accomplice of Collazo. On February 18, 1969, Collazo pleaded guilty to two counts charging him with defrauding the United States in violation of 18 U.S.C. §§ 1001–2 by arranging sham marriages for the purpose of securing immigration benefits. Shortly thereafter Collazo decided to cooperate with the investigators. On February 24, 1970, faced with Collazo's statements, Camacho, after earlier denials, ad-

mitted that her marriage to Zaoutis had been fraudulent and signed a statement giving the details.[3]

On May 20, 1970, less than five years after the INS had adjusted appellee's status, the District Director of the INS issued a notice of intention to rescind Zaoutis' adjustment of status pursuant to 8 C.F.R. § 246.1.[4] Following a series of delays, none of which are attributable to the INS,[5] a hearing was commenced before Immigration Judge Joseph J. Mack. After defense counsel moved to dismiss the proceeding as barred by § 246(a), it was adjourned to await briefs and the Ninth Circuit's decision in *Singh v. I.N.S.,* 456 F.2d 1092 (9th Cir.), *cert. denied,* 409 U.S. 847, 93 S.Ct. 53, 34 L.Ed.2d 89 (1972), which was to hold that a district director's issuance of a notice of intention to rescind tolled the five-year period prescribed by § 246(a).

On April 10, 1972, Judge Mack, relying on *Singh,* denied Zaoutis' motion to dismiss. After another series of delays the hearing was finally completed on February 7, 1973. Judge Mack ruled on October 15, 1973, that Zaoutis had been ineligible for adjustment

**2.** Because of the limited number of visas available to prospective Greek immigrants, Zaoutis ordinarily would have been unable to enter or remain in the United States as a lawful immigrant, at least for a long time. However, a valid marriage to a United States citizen entitles the alien spouse to immediate entry or adjustment of status to that of permanent resident alien. See § 201(b) of the Immigration and Nationality Act, 8 U.S.C. § 1151(b).

**3.** Camacho swore that Collazo had arranged her marriage to Zaoutis, that she participated in return for money, that she had never loved or cohabited with Zaoutis, that she had been given a rent free apartment in return for keeping Zaoutis' name on the mailbox and some of his clothes in the closet, that they did not speak each other's language, and that on the single night Zaoutis spent in the apartment (during the INS investigation) they occupied separate rooms.

**4.** "*§ 246.1 Notice.*

"If it appears to a district director that a person residing in his district was not in fact eligible for the adjustment of status made in his case, a proceeding shall be commenced by the personal service upon such person of a notice of intention to rescind which shall

inform him of the allegations upon which it is intended to rescind the adjustment of his status. In such a proceeding the person shall be known as the respondent. The notice shall also inform the respondent that he may submit, within thirty days from the date of service of the notice, an answer in writing under oath setting forth reasons why such rescission shall not be made, and that he may, within such period, request a hearing before a special inquiry officer in support of, or in lieu of his written answer. The respondent shall further be informed that he may have the assistance of or be represented by counsel or representative of his choice qualified under Part 292 of this chapter, without expense of the Government, in the preparation of his answer or in connection with his hearing, and that he may present such evidence in his behalf as may be relevant to the rescission."

**5.** The delays were occasioned by Zaoutis' lawyer's absence from the country, and a request for Zaoutis' testimony by the Grievance Committee of the Bar Association of the City of New York and arrangements pertaining thereto.

of status on August 25, 1965, because his marriage to Camacho had been a sham. The Board of Immigration Appeals ("the Board") dismissed Zaoutis' appeal on May 2, 1974, and Zaoutis commenced this action in the district court seeking injunctive and declaratory relief on June 10, 1975.

The sole issue presented to the district court on cross motions for summary judgment was whether rescission of Zaoutis' adjustment of status was timely under § 246(a). The district court, 418 F.Supp. 198, held that the INS's service, on May 10, 1970, of a notice of intent to rescind did not amount to a determination to "the satisfaction of the Attorney-General" that Zaoutis "was not in fact eligible for such adjustment of status," as that phrase is used in § 246(a) and that the determination was only made when the Board of Immigration Appeals, acting for the Attorney General, issued its order on May 2, 1974, affirming the initial decision of the special inquiry officer and dismissing Zaoutis' appeal, which was more than five years after the adjustment of his status. On this appeal the INS argues that the District Director's service on May 20, 1970, within the five-year period, of notice of intent to rescind the adjustment tolled the provisions of § 246(a).

## DISCUSSION

Section 246(a) of the Act, 8 U.S.C. § 1256(a) provides in pertinent part that "If, at any time within five years [after a person's status had been adjusted] . . . it shall appear to the satisfaction of the Attorney General that the person was not in fact eligible for such adjustment of status, the Attorney General shall rescind the action taken. . ."

Read literally, the statute's language requires only that the Attorney General be satisfied as to the alien's ineligibility within five years after the adjustment, not that he rescind within that period of time. If satisfied within the five-year period that the person had been ineligible for adjustment, the Attorney General may rescind thereaft-

er. The central question governing this appeal, therefore, is what Congress meant by the term "appear to the satisfaction." Did it mean that the Attorney General must within the five-year period reach a final and irrevocable decision manifested by some act such as a rescission order? Or would the institution of rescission proceedings based upon a completed investigation suffice?

Zaoutis argues that the Attorney General cannot be "satisfied" as to ineligibility until an Immigration Judge, as his delegate, see § 103 of the Act, 8 U.S.C. § 1103, 8 C.F.R. § 1.1(e), has heard the evidence and issued an order of rescission and the Board of Immigration Appeals has dismissed the appeal. The government, on the other hand, contends that this mechanical or wooden construction of the phrase ignores the fact that the evidence of ineligibility may be so overwhelming at the close of the District Director's investigation that he, as the Attorney General's delegate, may be satisfied when he serves the notice of intent to rescind. Moreover, argues the government, its position has the support of prior judicial and administrative interpretation of almost identical language used in similar predecessor statutes, which predated Congress' adoption of § 246(a).

As happens often in our search for the true meaning of an ambiguous legislative enactment, it becomes important to inquire into the purpose of § 246(a) and the practical consequences of the differing interpretations offered by the parties in order to determine which construction accords with Congress' intent as well as the statute's language. Where the results of a "plain meaning" interpretation do violence to the drafters' clear intent, the tempering influence of a flexible judicial construction plays an important role in avoiding injustice. As Learned Hand said long ago: "There is no surer guide in the interpretation of a statute than its purpose when that is sufficiently disclosed; nor any surer mark of over solicitude for the letter than to wince at carrying out that purpose because the words used do not formally quite match

with it." *Federal Deposit Ins. Corp. v. Tremaine,* 133 F.2d 827, 830 (2d Cir. 1943). "It is commonplace that a literal interpretation of the words of a statute is not always a safe guide to its meaning." *Peter Pan Fabrics, Inc. v. Weiner Corp.,* 274 F.2d 487, 489 (2d Cir. 1960), see also *Guiseppi v. Walling,* 144 F.2d 608, 624 (2d Cir. 1944) ("It does not therefore seem to me an undue liberty to give the section as a whole the meaning it must have had, in spite of the clause with which it begins. . . . There is no surer way to misread any document than to read it literally".); *Eck v. United Arab Airlines,* 360 F.2d 804, 812–14 (2d Cir. 1966).

Language to the effect that the Attorney General must be "satisfied" as to an alien's status before taking action adverse to the alien, such as deportation, is found in federal immigration laws going back to the Act of October 18, 1888, Ch. 1210, 25 Stat. 565, 566, which authorized the Attorney General, upon being satisfied that an immigrant had illegally entered the United States, to return him within one year to his country of origin. Consistently, the time limits fixed by these statutes have been interpreted administratively as requiring only that proceedings be instituted rather than completed within the specified period. See, e. g., *In re Deportation of Montuori,* Solicitor of Labor Opinion 4–7, Aug. 13, 1913. With the exception of the Third Circuit this interpretation has been adopted by numerous federal courts. See, e. g., *United States ex rel. Patton v. Tod,* 297 F. 385 (2d Cir.), *appeal dismissed,* 267 U.S. 607, 45 S.Ct. 229, 69 L.Ed. 811 (1924). Thus when Congress chose in 1952 to adopt § 246(a), see Immigration and Nationality Act, Ch. 477, § 246, 66 Stat. 163 (1952), as amended, 8 U.S.C. § 1256, without changing the language herein issue, it presumably accepted the prior settled administrative and judicial interpretation of that language, see *Commissioner v. Noel Estate,* 380 U.S. 678, 681–82, 85 S.Ct. 1238, 14 L.Ed.2d 159 (1965), and the Attorney General's interpretation would under the circumstances be entitled to considerable respect, see *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965).

Aside from this historical background, an interpretation to the effect that the time limit fixed by § 246(a) may be tolled by the institution of rescission proceedings within five years, based on evidence which would reasonably mandate rescission, is not contrary to the statute's plain language. Although the Attorney General should not be entitled to toll the time limit merely by instituting proceedings without probable cause, where he acts in good faith on the basis of evidence which should reasonably call for a rescission order, it may fairly be said that the alien's ineligibility appears to his "satisfaction." Moreover, an interpretation which would toll the statute when the District Director justifiably and in good faith initiates a rescission proceeding is consistent with the policies underlying a statute of limitations such as § 246(a). See *Burnett v. New York Central Railroad Co.,* 380 U.S. 424, 428, 85 S.Ct. 1050, 13 L.Ed.2d 941 (1964). The filing of the intention to rescind puts the alien on notice that he must seek to collect and preserve favorable evidence so that the passage of time will not prejudice his opportunity to defend against the charges against him. If, on the other hand, no notice to rescind is filed within the five-year period, the alien may justifiably rely on his adjusted status. Furthermore, the tolling of § 246(a) by the good faith filing of a notice of intent to rescind based on substantial evidence protects the interests of the alien by not encouraging the INS either to initiate rescission proceedings before its investigation is completed and before the evidence satisfies the Attorney General's delegate of the necessity for rescission or to rush pending proceedings to conclusion in an effort to insure that a rescission order will be entered before the expiration of the five-year period. At the same time, the interpretation eliminates any incentive for the defendant to seek to stall at every stage of the proceedings in the hope that the five-year period will expire prior to a final determination by the Board. The effect of such an interpretation, as the Ninth Circuit has noted in *Singh v. INS, supra,* should be

to promote full and fair investigations and hearings in the interest of the alien, the agency, and the public.

For these reasons we hold that where a District Director of the INS, acting in good faith within five years after the adjustment of an alien's status, issues a notice of intention to rescind the adjustment on the basis of evidence that is prima facie sufficient to warrant the issuance of a rescission order, the five-year time limit prescribed by § 246(a) is tolled. Our decision is directly in accord with the Ninth Circuit's decision in the remarkably similar case of *Singh v. INS, supra,* holding that the District Director's issuance of a notice of intention to rescind the appellant's adjustment of status, which had been obtained (as here) on the basis of a sham marriage, tolled the five-year period prescribed by § 246(a). Moreover, we believe that Zaoutis' heavy reliance on the Third Circuit's decision in *Quintana v. Holland,* 255 F.2d 161 (3d Cir. 1958), is misplaced. That decision, because of significant factual differences, is not inconsistent with our holding or that of the Ninth Circuit in *Singh.*

In *Quintana* the District Director had filed within the five-year period a notice of intention to rescind appellant's adjustment of status on the ground that he was a member of the Communist Party. Following then-existing procedures,[6] which vested the District Director with control over the hearings and investigation of the charges, the District Director assigned the case to and investigating officer who was unable to obtain sufficient proof of the charges and the case was dropped. After the five-year period had expired, the INS reopened the case and after further investigation, and hearings the district and regional directors recommended rescission, which was adopted by Congress. The court held that notice

given to appellant within the five-year period did not satisfy the pertinent language of § 246(a).

"We think that something appearing to an officer's 'satisfaction' means that he must have something more than a hunch about it, or even more than that he may be convinced in his own mind. We think it means a reasonable determination made in good faith after such investigation and hearing as is required. Here the Attorney General could have made no such determination by the end of the five-year period from the latest possible date that can be considered. As of that time the only investigation had concluded negatively and the Service was engaged in seeking further evidence with which to convince an inquiry officer that the plaintiff had improperly secured his status. We are, therefore, of the view that the statute has not been followed in this case." 255 F.2d at 164 (footnotes omitted).

Thus, in effect the District Director in *Quintana* issued a notice of intention to rescind on the basis of suspicion rather than evidence that could reasonably have appeared to his "satisfaction," as an agent of the Attorney General, to warrant rescission. As the court pointed out in *Singh,* this non-compliance with § 246(a) was attributable to then-existing procedures placing both the investigation and the hearing of the charges under the control of the District Director, which have since been changed so that the Special Inquiry Officer rather than the District Director now controls the hearing, with power to protect the defendant against prejudicial delay, 8 C.F.R. § 246.4. In any event, the important distinction is that in both *Singh* and the present case the service of the notice of intent to rescind

---

**6.** The INS investigatory procedure applicable to *Quintana* required an alien contesting rescission to make a personal appearance before an immigration officer under control of the District Director. The officer reported to the District Director who, in turn, made a recommendation to the regional director. In the case of an individual whose status had been adjusted by a concurrent Congressional resolution, as

was the case with *Quintana* (255 F.2d at 162), the regional director, as delegate of the Attorney General, made a recommendation to Congress. 8 C.F.R. § 246.12(b), 19 F.R. 9179 (Dec. 24, 1954). Compare 8 C.F.R. § 246 in which a Special Inquiry Officer, independent of the District Director, makes a final decision after hearings, which is appealable to the Board.

was made only after evidence was uncovered that made it reasonably apparent to the satisfaction of the District Director, who was not in control of the adversary proceeding, that Zaoutis had been ineligible for adjustment of status because the marriage on which it was based had been a sham. In *Quintana,* on the other hand, the District Director, who controlled the proceeding throughout, could not have been so satisfied at the time when he served the notice of intent because "the only investigation had concluded negatively and the Service was engaged in seeking further evidence", 255 F.2d at 164.[7]

██ Zaoutis also seeks to uphold the District Court's decision on the ground that immigration statutes must be interpreted favorably to the alien, particularly when they work harsh consequences. *Lennon v. I.N.S.,* 527 F.2d 187 (2d Cir. 1975); *Marino v. I.N.S.,* 537 F.2d 686 (2d Cir. 1976). However, we have not followed this principle of interpretation where, as here, there is clear evidence that the alien has engaged in fraud against the agency. *Reid v. INS,* 492 F.2d 251, 257 (2d Cir. 1974); *Heitland v. INS,* 551 F.2d 495, 503 (2d Cir. 1977). In addition, rescission of Zaoutis' adjustment of status does not automatically result in the harsh consequence of deportation, for which an order can be entered by an Immigration Judge only after the alien has been given an opportunity to present favorable evidence based on his record during his stay in the United States, 8 C.F.R. § 242, but returns him to his previous nonimmigrant status.

The judgment of the district court is reversed and the order of the Board of Immigration Appeals is reinstated.

---

7. *Singh* and *Quintana* also reach consistent results in requiring that completion of the investigation of the adjustment of status occur within the five-year period, without setting time limits on the rescission proceedings. Although the language "it shall appear to the satisfaction of the Attorney General" in the first part of § 246(a) is identical to that in the latter part of § 246(a), which is before us in this case and was before the Ninth Circuit in *Singh,* it is evident that the context of the phrases are significantly different, see note 1, *supra.* Appellant's status in *Quintana* had been adjusted by a concurrent Congressional resolution pursuant to § 19(c) of the Act (repealed July 27, 1952). The first portion of § 246(a) requires a concurrent resolution to rescind such an adjustment, and requires that within the five-year period if "it shall appear to the satisfaction of the Attorney General" that the adjustment should be rescinded he shall submit to Congress a "compete and detailed report." Thus

the Act vested investigation power in the Attorney General and rescission power in Congress, and the court in *Quintana* read the five-year limit to apply to the Attorney General's investigation power. Significantly, it did not interpret the statute as limiting the time in which Congress could pass a resolution rescinding the adjustment.

The Ninth Circuit's decision in *Singh* reached the same result, although the structure of the latter part of § 246(a) vests both the investigation and rescission powers in the Attorney General. By holding that the investigation must be completed and a notice of intent to rescind filed within the five-year period in order to toll the statute, the court has, like the Third Circuit, limited the investigation period to five years without putting a time limit on the rescission proceedings.